Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/04/2022 09:05 AM CDT

- 400 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

In re Interest of Draygon W. et al., children
under 18 years of age.
State of Nebraska, appellee, v. Robert L.,
appellant, and Dejah L., appellee.

___ N.W.2d ___

Filed October 4, 2022.    No. A-21-387.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights.** The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child.

3. **Parental Rights: Due Process.** The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection.

4. **Due Process: Words and Phrases.** While the concept of due process defies precise definition, it embodies and requires fundamental fairness.

5. **Parental Rights: Due Process: Appeal and Error.** In deciding due process requirements in a particular case, an appellate court must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the procedures in use. Due process is flexible and calls for such procedural protections as the particular situation demands.

6. **Parental Rights: Due Process.** Due process considerations safeguard a parent's right to custody of the children, subject only to the State's interest in protecting the children from harm.

7. **Juvenile Courts: Parental Rights.** Although Neb. Rev. Stat. § 43-248(2) (Reissue 2016) allows the State to take a juvenile into custody without

- 401 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

a warrant or order of the court when it appears the juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection, the parent retains a liberty interest in the continuous custody of his or her child.

 8. **Juvenile Courts: Child Custody: Parental Rights.** An ex parte order subsequently authorizing temporary custody with the Department of Health and Human Services is permitted because of its short duration and the requirement of further action by the State before custody can be continued.

 9. **Parental Rights: Notice.** The State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent a meaningful hearing.

10. **Juvenile Courts: Parental Rights: Time.** A prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests.

11. **Juvenile Courts: Proof.** Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile.

12. **Appeal and Error.** On appeal, a party cannot complain of error which the party has invited the court to commit.

13. **Statutes: Time: Minors.** Neb. Rev. Stat. § 43-278 (Reissue 2016) provides that an adjudication hearing shall be conducted within 90 days after a petition is filed. However, upon a showing of good cause, the court may continue the case beyond the 90-day period.

14. ____: ____: ____. The 90 days to conduct a hearing after a petition is filed, as set forth in Neb. Rev. Stat. § 43-278 (Reissue 2016), is directory, not mandatory. As such, the provision does not mandate that a case be dismissed if the adjudication is not completed within 90 days.

15. **Juvenile Courts: Jurisdiction.** To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016).

16. **Juvenile Courts: Jurisdiction: Proof.** While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm.

17. **Parental Rights: Proof.** The State must prove the allegations in a petition for adjudication filed under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) by a preponderance of the evidence.

- 402 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

18. **Juvenile Courts: Jurisdiction.** Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile.
19. **Juvenile Courts: Trial: Witnesses.** The juvenile court, as the trier of fact, was entitled to weigh the credibility of the witnesses.
20. **Trial: Witnesses.** In a bench trial, the judge sitting as the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony.

Appeal from the Separate Juvenile Court of Douglas County: Candice J. Novak, Judge. Affirmed.

Robert L., pro se.

David Ceraso, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student.

Thomas G. Incontro, guardian ad litem.

Pirtle, Chief Judge, and Riedmann and Welch, Judges.

Pirtle, Chief Judge.

## INTRODUCTION

Robert L. appeals the order of the Douglas County Separate Juvenile Court, which adjudicated his minor children and stepchild under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Upon our de novo review of the record, we affirm.

## BACKGROUND

Robert is the biological father of Korben L., born in April 2011; Arya L., born in April 2013; Sebastian L., born in August 2014; and Ronan L., born in September 2016, as well as the stepfather of Draygon W., also known as Jade W. (Jade), born in July 2006. Dejah L. is the biological mother of all five children.

On May 30, 2019, law enforcement brought the children to Project Harmony after Korben made statements at school about physical abuse occurring at home. Jade, Korben, and Arya were interviewed at Project Harmony. As a result of

- 403 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

disclosures made during the interviews, Dejah was arrested. The children returned home with Robert, but the Department of Health and Human Services (DHHS) implemented a safety plan for the family, and there were ongoing services in the home. The safety plan included requirements that Dejah could not be alone with the children and that there could be no physical discipline. Robert subsequently posted Dejah's bond, and she was released from jail on June 2.

On October 8, 2019, Robert brought Jade to Project Harmony based on a sexual assault allegation unrelated to Dejah or Robert. Forensic interviews were conducted of Jade and Korben. The children were removed from the home based on disclosures made by Jade and Korben that physical abuse had continued in the home, despite the safety plan, and based on concerns of witness tampering as the children were witnesses in Dejah's criminal matter.

In October 2019, the State filed a petition alleging that the minor children lacked proper parental care due to the faults and habits of Dejah and were, therefore, within the meaning of § 43-247(3)(a). The juvenile court subsequently adjudicated the children in regard to Dejah.

In December 2019, the State filed a supplemental petition alleging that the children lacked proper parental care due to the faults and habits of Robert and were within the meaning of § 43-247(3)(a). Specifically, the supplemental petition alleged under count I that Robert failed to provide safe, stable, and/or appropriate housing for the juveniles; Robert failed to provide proper parental care, support, and/or supervision for the juveniles; Robert had left the juveniles with an inappropriate caregiver; Robert had subjected the juveniles to inappropriate physical touch; and for the above reasons, the juveniles were at risk for harm.

An adjudication hearing was held in January 2021 in regard to the supplemental petition. Jade testified in chambers at the hearing. At the time of adjudication, Jade was 14 years old and was in the 9th grade.

- 404 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

Jade testified about the discipline and punishment in the home, specifically by Robert. She stated that Robert would spank her, Korben, Arya, and Sebastian with a belt. The spankings occurred often and left marks around the area of the buttocks. With regard to Robert's spanking Jade, it occurred "[q]uite frequently" and normally lasted around a minute. Jade testified that the spankings occurred so frequently that it became "a sort of fact of life." Before the spankings, Robert would tell her to bend over the couch and put her face into the couch cushion. Jade would normally be wearing pants during the spankings, but on several occasions, she did not have pants on.

Jade also testified that Robert had thrown her across the room on multiple occasions. In addition, when she was 9 or 10 years old, Robert sat on her back to prevent her from running while Dejah sat on the other side and spanked her with a fly swatter. Robert had also instructed Jade's siblings to sit on her back, and she was then forced to do a large number of pushups.

Jade testified that on one occasion, Robert hit her when she was brushing her teeth. When she began to cry, Robert shook her and told her to stop crying. She stated that Robert had shaken her multiple times.

Jade also testified that Robert and Dejah would hit the children with a plastic furniture post. She stated that Robert and Dejah hit her with the post on numerous occasions (exceeding 10) and that they also hit her siblings with it. Robert would hit the children on the buttocks, and the force was strong enough to leave marks. Jade also testified that there were times the children were sent to bed without food as punishment by their parents.

Jade testified about other physical abuse by Dejah. She testified that Dejah had slapped her across the face, shoved her to the ground, and strangled her. She explained that when Dejah strangled her, she would put her hand on Jade's neck and restrict her breathing. She stated that it happened three or four

times. The abuse by Dejah occurred in the presence of Jade's siblings. She also testified that Dejah had slapped Korben, Arya, and Sebastian.

Jade testified that she never discussed or reported the abuse by Dejah to Robert because she believed he would have been supportive of Dejah. She explained that because Robert employed similar punishment practices, he would have seen Dejah's actions as normal or acceptable.

On cross-examination, Jade testified that after the May 2019 Project Harmony interview, Robert and Dejah were upset with her about what she disclosed and she believed they wanted her to recant her statements about the abuse and "say that nothing happened and then that I was being overdramatic and overreacting."

Amy Cirian, the forensic interview program manager for Project Harmony, conducted the May 2019 interviews with Jade, Korben, and Arya. During Arya's interview, she told Cirian that her mother, Dejah, would strangle Jade and Korben and would hit the children with objects and with her hand. She also stated that Robert would spank the children with a belt. Jade told Cirian that Dejah would strangle her and that Robert would spank her with a belt. Korben also told Cirian that Dejah had strangled him and that he had seen Dejah strangle Jade. He also stated that his dad spanked him with a belt. Cirian testified that the statements made by the children during the forensic interviews were consistent with each other.

Cirian also conducted forensic interviews with Sebastian and Arya in October 2019. She testified that the purpose of the interviews was to see if the abuse was still occurring and that there was also concern the children were being coached by the parents. Arya told Cirian that spankings had occurred since the last interview in May, but no strangulation had occurred that she was aware of. During Sebastian's October interview, which was his first, he talked about spankings and getting hit with objects as punishment in the home. Cirian testified that

- 406 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

nothing disclosed in the October interviews contradicted the disclosures in the May interviews.

Ashley Harris, a nurse practitioner and manager of the medical department for Project Harmony, testified that she completed a medical examination of Arya on October 8, 2019. During the examination, Arya told Harris about physical abuse at home. Arya said that sometimes when she gets in trouble, she gets spanked or slapped by Robert or Dejah. Arya also told Harris about an "ultimate punishment," where Dejah pushes Jade to the ground, grabs her neck, and chokes her. Arya further revealed that the "ultimate punishment" can also include getting punched in the nose. Arya told Harris she had watched the ultimate punishment occur at least five times.

Marlene Rieder, a sergeant with the Omaha Police Department in the special victims unit, testified that she observed Jade's forensic interview in October 2019. Rieder testified that during the interview, Jade refused to answer questions about safety in the home because her parents' attorney told her not to answer questions or talk about safety in the home. Following the October 2019 interview, Rieder learned that there had been a prior investigation in May, resulting in Dejah's being arrested for child abuse.

Rieder also spoke with Robert the day of Jade's and Korben's October 2019 interviews. Rieder learned that Dejah had returned home while she was out on bond. Robert told Rieder that he did not believe the charges of abuse. He stated he did not believe any abuse ever happened and that he would know if his children were being abused. Rieder found it concerning that Robert did not believe any abuse occurred in the home, especially considering that all the children interviewed disclosed the presence of abuse in the home, on two separate occasions, 5 months apart. After Rieder's discussion with Robert, the children were removed from the home based on Robert's disbelief of the pending charges against Dejah and to prevent the children from recanting their allegations.

- 407 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

Kaitlin Hahn, a domestic violence supervisor with DHHS, testified that she became involved with the case following the removal of all the children from their residence on October 8, 2019. She testified that the removal was based on disclosures of physical abuse made by Jade and Korben and concerns of tampering with the children because they were witnesses in a criminal matter. Hahn testified that despite the safety plan and services that were implemented in May, the children still made disclosures of the same type of abuse in October.

Hahn testified that in her opinion, the children would be at risk of harm if returned to Robert's home because he would not protect them. In forming her opinion, she relied in part on the May and October forensic interviews. She considered the statements about physical abuse, including Jade's and Korben's disclosures that Dejah had strangled them and concerns the children had about Robert's bailing Dejah out of jail. Hahn testified that the concerns about witness tampering after the initial disclosures in May 2019 also weighed into her opinion. The children stated in the October interviews that they were told not to discuss the abuse by their parents, which then led to conversations with prosecutors concerning witness tampering. Hahn also took into consideration Robert's failure to believe that Dejah had physically abused the children. Hahn found that concerning because it showed Robert's inability to protect his children.

After the State rested, Robert testified in his own behalf. Robert admitted to spanking Jade with his hand and with a belt. Robert's testimony regarding his method of spanking Jade mirrored her testimony and her statements in her forensic interviews. Robert testified that he spanked Jade with a belt 200 to 300 times over a 3- to 4-year period. Robert stated that there were never any red marks after spanking his children, but he admitted that he never checked. He acknowledged that the children discussed red marks left from spankings in their forensic interviews. Robert testified that he spanked Korben and Arya with his hand on occasion, but did not spank them

- 408 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

with a belt. He also testified there were a few times he made
Jade carry a 20-pound weight around the house as punishment. Robert denied ever throwing Jade across the room, but
explained that there was an exchange between them one time
that could have been perceived that way.

Robert and the children continued living with Dejah after
the children's disclosures of abuse in May and October 2019.
Robert testified that he did not believe that physical abuse
occurred in the home. He also did not believe that Dejah
strangled any of the children. Robert denied ever seeing Dejah
choke any of the children or hit any of them with an object.
Despite Arya's, Korben's, and Jade's disclosures that Dejah
choked them, Robert stated that he did not believe it occurred.

Robert testified that prior to the May 2019 allegations, he
had no reason to believe that Dejah was abusing the children,
and after the allegations were made, he did not believe the
children. At the time of the hearing, Robert continued to deny
that any abuse occurred, even after he had viewed the forensic
interviews with the children in May and October and had heard
Jade and Korben testify in the proceeding against Dejah. He
testified that he believed Dejah that no abuse occurred. He also
testified that Jade had a history of being dishonest and is good
at manipulating the other children.

Robert testified that Dejah was against any sort of physical
punishment. He stated there were a couple times she spanked
the children or imposed some form of physical punishment, but
it was rare, and usually at his urging.

He also testified that he was aware of Jade's and Arya's
allegation that the children would sit on Jade as she was forced
to do pushups, but he stated they did not sit on her as a punishment. Robert also acknowledged that Arya described the "ultimate punishment" and that she had observed Dejah impose the
punishment. Robert's testimony failed to confirm or deny the
children's statements, but, rather, it merely acknowledged that
they were made.

- 409 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

Robert also testified that after the May 2019 forensic interviews, he did not talk to the children about the allegations. He stated that he was told by Dejah's attorney, as well as individuals from the Omaha Police Department and DHHS, not to discuss anything about the case with the children. Robert testified there were two occasions when the children were asking questions and he told them they could not talk about the case.

In April 2021, following the adjudication hearing, the juvenile court found that the State had met its burden of proof in regard to the allegations in the supplemental petition by a preponderance of the evidence. It, therefore, adjudicated the children as being within the meaning of § 43-247(3)(a). The juvenile court found Jade's testimony to be credible, reliable, and probative, and it found Robert's testimony misleading, unreliable, and not credible.

## ASSIGNMENTS OF ERROR

Robert, pro se, assigns 29 errors on appeal; however, the "Arguments" section of Robert's brief is presented as numbered paragraphs, with no separate headings or arguments to correlate with any particular assigned error listed in the assignments of error section. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. See *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019). These briefing requirements apply equally to represented litigants and pro se litigants. See *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if he or she had been represented by attorney, and concurrently, that litigant is held to same standards as one who is represented by counsel). Accordingly, we decline to address any assigned errors which were not argued and supported in the arguments section of Robert's brief. Ultimately, we can only discern two issues in Richard's argument section of his brief that correlate to his

- 410 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

assigned errors: (1) His due process rights were violated by the delay in holding a detention hearing and the delay in holding an adjudication hearing, and (2) the court erred in finding there was sufficient evidence to adjudicate the children. We will address those two claims in our analysis.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Due Process Violations.*

Robert first assigns his due process rights were violated by the delay in holding a detention hearing and the delay in holding an adjudication hearing. He first argues that he was denied custody of his children without due process when the children were removed from the home on October 9, 2019, based on allegations against Dejah, and a detention hearing was not held until April 22, 2020.

[2-6] The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Sloane O.*, 291 Neb. 892, 870 N.W.2d 110 (2015). The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). While the concept of due process defies precise definition, it embodies and requires fundamental fairness. *Id.* In deciding due process requirements in a particular case, we must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the

- 411 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

procedures in use. *In re Interest of Sloane O., supra.* Due process is flexible and calls for such procedural protections as the particular situation demands. *Id.* Due process considerations safeguard Robert's right to custody of the children, subject only to the State's interest in protecting the children from harm. See *id.*

[7-11] Although Neb. Rev. Stat. § 43-248(2) (Reissue 2016) allows the State to take a juvenile into custody without a warrant or order of the court when it appears the juvenile "is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection," the parent retains a liberty interest in the continuous custody of his or her child. *In re Interest of Mainor T & Estela T., supra*. An ex parte order subsequently authorizing temporary custody with DHHS is permitted because of its short duration and the requirement of further action by the State before custody can be continued. *Id.* But the State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent a meaningful hearing. *Id.* A prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests. *Id.* Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Mainor T. & Estela T., supra.*

In *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998), the Nebraska Supreme Court recognized that parents have a due process right to be free from an unreasonable delay in providing the parents a meaningful hearing after an ex parte order for immediate custody is filed. The court concluded that the mother's due process rights were not violated by a 14-day delay between the entry of

- 412 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

an ex parte order and that of a detention order when she was given an opportunity to be heard at the detention hearing and was allowed to visit her children in the interim. But the court cautioned that this 14-day delay between the ex parte order and detention hearing was "on the brink of unreasonableness." *Id.* at 423, 470 N.W.2d at 792.

In the present case, the ex parte order was entered on January 2, 2020, following the filing of the supplemental petition to adjudicate in regard to Robert. On January 3, the court scheduled a detention hearing for January 13. This timeframe was less than the 14-day "brink of unreasonableness" set forth in *In re Interest of R.G., supra*. The detention hearing began on January 13, but was continued to February 4, due to time constraints. However, on January 14, the court entered an order sustaining Robert's motion for discovery. On January 30, the court entered an order sustaining a joint motion of the parties to continue the detention hearing scheduled for February 4 "for good cause shown due to difficulties in the Discovery Process." The detention hearing was set for March 25.

On March 18, 2020, the State filed a motion to continue the detention hearing because of the COVID-19 pandemic. Robert filed an objection. On March 24, the court entered a continuance order for good cause due to the pandemic. On April 7, the court set the detention hearing for April 22, and the detention hearing took place that day. The court entered its order the next day, finding that the children should remain in protective custody.

Robert argues that the juvenile court failed to timely hold a detention hearing, thereby denying him custody during this timeframe, in violation of his right to due process. Although the ex parte order was entered on January 2, 2020, and the detention hearing did not conclude until April 22, we conclude that the delay in holding the detention hearing was not unreasonable. Robert was initially granted a prompt detention hearing on January 13, which was 11 days after the ex parte order was entered. The detention hearing was continued because

- 413 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

the court ran out of time. The court promptly rescheduled the hearing for February 4, but was unable to hold the detention hearing on that date due to Robert's request for discovery and a subsequent joint motion by the parties to continue due to issues with discovery.

[12] Stated another way, the court commenced a timely detention hearing, and then rescheduled a timely hearing, which was then continued by Robert who wanted to conduct discovery. On appeal, a party cannot complain of error which the party has invited the court to commit. *In re Interest of Marquee N.*, 30 Neb. App. 862, 974 N.W.2d 26 (2022). Because the detention hearing was delayed as a result of Robert's discovery request, we conclude that his due process rights were not violated by the delay.

[13,14] Robert also contends that his due process rights were violated by the delay in holding an adjudication hearing. Neb. Rev. Stat. § 43-278 (Reissue 2016) provides that an adjudication hearing shall be conducted within 90 days after a petition is filed. However, upon a showing of good cause, the court may continue the case beyond the 90-day period. This court has held that § 43-278 is directory, not mandatory. See *In re Interest of Brianna B. & Shelby B.*, 9 Neb. App. 529, 614 N.W.2d 790 (2000). As such, the provision does not mandate that a case be dismissed if the adjudication is not completed within 90 days. *Id.*

There were multiple factors that affected the delay in holding an adjudication hearing. One factor was the COVID-19 pandemic, which caused several continuances. Another factor causing delay was an appeal filed by Robert in May 2020 challenging the court's April order that the children remain in the temporary custody of DHHS. We ultimately determined that the order being appealed from was not a final, appealable order and dismissed the appeal. A petition for further review was filed with the Supreme Court, further delaying an adjudication hearing. Another delay occurred as the result of the

- 414 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

retirement of the juvenile court judge who had been handling the case and the reassignment of the case.

We conclude that good cause existed to extend the timeframe beyond the 90-day period set forth in § 43-278 and that the delay in the adjudication hearing did not deny Robert due process.

*Sufficiency of Evidence to Adjudicate.*

Robert next assigns that the juvenile court erred in finding that the State met its burden to prove the allegations in the supplemental petition by a preponderance of the evidence and as a result, adjudicating the children within the meaning of § 43-247(3)(a).

[15-17] To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id.*

[18] Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile. *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020). The grounds alleged in the supplemental petition here, which the juvenile court found were proved by sufficient evidence, included that the children lacked proper parental care by reason of the faults or habits of Robert in that he failed to provide safe, stable, and/or appropriate housing for the juveniles; he failed to provide proper parental care, support, and/or supervision for the juveniles; he had left the juveniles with an inappropriate caregiver; he had subjected the juveniles to inappropriate physical touch; and for the above reasons, the juveniles were at risk for harm.

- 415 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

[19,20] In reaching its decision that the State had proved the allegations in the supplemental petition by a preponderance of the evidence, the juvenile court found Jade's testimony, as well as the other State's witnesses' testimony, credible, probative, and entitled to weight. It found that Robert's testimony was misleading, unreliable, and not credible. Robert contends that the court erred in finding his testimony was not credible. The juvenile court, as the trier of fact, was entitled to weigh the credibility of the witnesses. See *In re Interest of J.L.H., J.L.H., and R.H.*, 2 Neb. App. 40, 507 N.W.2d 641 (1993) (in bench trial, judge sitting as trier of fact is sole judge of credibility of witnesses and weight to be given their testimony). When evidence is in conflict in a juvenile case, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Michael R.*, 11 Neb. App. 903, 662 N.W.2d 632 (2003). Here, we give weight to the fact that the juvenile court, after hearing Robert's testimony, found it not credible and accepted the State's witnesses' version of the facts.

Based on our de novo review of the record, the State presented ample evidence to establish that the children are within the meaning of § 43-247(3)(a). In May 2019, three of the children disclosed that Dejah had physically abused them, including choking or strangling two of the children, and Dejah was subsequently arrested. Robert posted Dejah's bond several days later, and she was released from jail. He allowed her to return home and did not acquire separate housing for himself and the children. Despite a safety plan being in place, the children disclosed that physical discipline was still occurring in October. There were also concerns at that time that the children were being told by Robert to recant their statements of abuse or to not talk about the abuse further.

Most importantly, Robert chose not to believe any of the children, even after all of them who were interviewed disclosed abuse by Dejah. He told Rieder, an Omaha Police

- 416 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF DRAYGON W. ET AL.
Cite as 31 Neb. App. 400

Department sergeant, that in October 2019, he did not believe Dejah ever physically abused the children. He also testified at the adjudication hearing that he did not believe Dejah strangled any of the children and did not believe that any physical abuse ever occurred in the home. He further testified that Jade has a history of being dishonest and is good at manipulating her siblings. Based on Robert's refusal to believe his children, he has failed to protect them.

In addition to the evidence of Dejah's abuse and Robert's failure to believe his children, there was evidence of Robert's using physical discipline, including spanking the children with a belt, forcing Jade to do pushups with her siblings sitting on her back, hitting the children with a plastic post, and slapping the children.

Based on the foregoing, we find that the juvenile court did not err in finding sufficient evidence to adjudicate the children under § 43-247(3)(a).

## CONCLUSION

We conclude that the juvenile court did not err in adjudicating the children in regard to Robert. Accordingly, the court's order is affirmed.

Affirmed.