IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF IVY R. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF IVY R. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KRYSTAL R., APPELLANT.

Filed August 22, 2023.    No. A-23-079.

Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge.
Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Hilary A. Burrows for appellant.

Alexis Homme, Deputy Douglas County Attorney for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## INTRODUCTION

Krystal R. appeals from the order of the separate juvenile court of Douglas County, which adjudicated her minor children under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). She argues that the juvenile court erred in its findings with respect to the State's reasonable efforts to prevent removal of the children from her home and the determination that the children were within the meaning of § 43-247(3)(a). For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

Krystal R. is the mother of Ivy R., born in 2010, Amaya S., born in 2015, and Lucas S., born in 2017. The children's father is not involved in this appeal and will not be mentioned further.

- 1 -

On September 15, 2022, the State filed a petition in the juvenile court, alleging that the children were within the meaning of § 43-247(3)(a). Specifically, the State alleged that the children lacked proper parental care due to Krystal's fault or habits and were at risk for harm because: (A) on or about September 14, 2022, law enforcement officials observed the family home in a filthy, unwholesome condition, (B) Krystal had failed to provide proper parental care, support, supervision, and/or protection to the children, and (C) Krystal had failed to provide the children with safe, stable, and/or appropriate housing.

Also on September 15, the State filed an ex parte motion for immediate custody and an accompanying affidavit asking the court to award the Nebraska Department of Health and Human Services (the Department) temporary custody of the children with placement to exclude Krystal's residence. The motion also alleged that the children were "seriously endangered in their surroundings," that their continuation in the home would be contrary to their health, safety, or welfare, and that immediate removal appeared necessary for their protection. Finally, the motion alleged that "reasonable efforts were made to prevent removal or exigent circumstances existed which precluded such efforts," with the reasonable efforts made being set forth in the accompanying affidavit. The affidavit outlined the officers' observations of the extremely cluttered, filthy, and unsanitary condition of the residence, Krystal's report that the water had been turned off the day before, her lack of a timeline as to when utilities would be turned back on at the residence, and lack of definite plans or an address of the friend with whom she reportedly planned to stay. The affidavit noted that the children were placed at Project Harmony by the officers due to the living conditions of the home.

The juvenile court granted the State's ex parte motion for immediate custody and placed the children in the temporary custody of the Department with placement to exclude Krystal's home. The preprinted portion of the court's ex parte order included a statement that "reasonable efforts were made to prevent removal or exigent circumstances precluded reasonable efforts being made" and that "[t]hose reasonable efforts included, but were not limited to, the facts set out in [the State's affidavit] and/or those set forth below." On the blank lines below this statement, the court wrote, "Exigent circumstances exist based on the contents of the affidavit."

A first appearance and detention/protective custody hearing was held before the juvenile court on September 21. Krystal appeared and entered a denial to the allegations of the petition, which was accepted by the court. The court found it in the children's best interests to remain in the Department's temporary custody with placement to exclude Krystal's home. In its written order following the hearing, the court found that "reasonable efforts have been made to eliminate or prevent removal of the minor children from the parental home to include, but not be limited to an initial risk assessment" and that "due to exigent circumstances, it would be contrary to the health and safety of the minor children to be returned home at this time." The court also ordered that Krystal was to be offered the following voluntary services: (1) family support services, (2) agency supervised visitation in a neutral location, (3) a co-occurring evaluation, and (4) drug testing.

Upon Krystal's motion, the juvenile court continued the adjudication hearing originally set for December 7, 2022, to January 5, 2023. At the January 5, adjudication hearing, the State's first witness was Officer Tyler Hansen of the Omaha Police Department. On September 13, 2022, Hansen and Officer Aaron Kruger responded to a radio call to the children's elementary school to check on their well-being. After contacting the children, the school principal, and the maternal

grandmother (who reported the concern) at the school, the officers transported the children to their residence. According to Hansen, when they contacted the children at school, they appeared "happy" and "clean."

At the residence, Hansen made contact with Krystal and explained the reason for the police visit. In response, Krystal told Hansen that her residence "was probably not as clean as it should be" and that she was "dealing with other issues with utilities," including the water having been turned off for the past few days. Upon entering the living room of the residence, Hansen observed "dirt and grime" covering the walls and trash "all over the floor and the furniture." Hansen elaborated that there were old food boxes and crumbs "all over the floor and furniture," and he described the home as "very cluttered." According to Hansen, the kitchen was also cluttered with trash and old food boxes. He testified, "You couldn't actually go into the kitchen, you could only go into the very front of it." Hansen observed that "there was no countertop space," and he testified that the kitchen did not appear to be usable. Hansen testified that there was "a little path from the front door to the kitchen to the hallway in between all the trash" where a person could walk, and he described the bedrooms as being similarly dirty and cluttered, similar to the living room and the kitchen. Hansen believed, based on the condition of the residence, that it "wasn't safe" and "wasn't hygienic or sanitary" for the children to live there. He concluded that the minor children were at risk of harm based on his observation of their living conditions and Krystal's report that she had no immediate plan to get the water turned back on. During Hansen's testimony, the juvenile court received into evidence various photographs depicting the cluttered and dirty living conditions in the residence.

Hansen agreed that Krystal cooperated with the officers. He noted her report that she planned to stay at a friend's house that evening, although she did not have an address for the friend's residence at that time. Hansen agreed that Krystal was proactively trying to address the living conditions in her residence, noting her report of contacting "at least a few" community resources to try to get the water turned back on and for other assistance. According to Hansen, he offered shelter options to Krystal, but that she declined and indicated her preference to stay with her friend as planned. Hansen confirmed that Krystal had shown the officers cases of bottled water she had at the residence and that there was food available for the children to eat. Hansen did not observe any bags being packed in preparation for leaving the residence, and he did not recall whether Krystal reported having packed any bags.

Kruger's testimony about the police contact at the school and transport of the children to the residence was consistent with Hansen's. Kruger testified that at the residence, the officers learned that Krystal was not employed, that the water had been shut off, and that the family did not have trash services at that time. Kruger's testimony about the condition of the home was also consistent with Hansen's. Kruger described the living room as "extremely cluttered and disarrayed." Kruger could not see any clear counter space in the kitchen, and he described the children's bedrooms being similarly cluttered as the living room. In the younger children's room, Kruger noted "fruit flies" and a bunk bed without much bedding. He thought they had a sheet that was "unkept, not clean." He also observed "unidentifiable" stains on the walls. According to Kruger, he had to "step on or over things" to gain entry to the older child's room, where he also observed fruit flies. After that, Kruger focused on entertaining the children in the living room while Hansen questioned Krystal further. Kruger concluded that the children were at risk of harm in

Krystal's care based on his observations as to the condition of the residence and Krystal's report of not having water or trash services. During Kruger's testimony, the State offered additional photographs depicting the cluttered and dirty state of the children's rooms, which were received into evidence by the juvenile court.

Following Kruger's testimony, the State rested. Krystal did not offer any evidence.

The juvenile court announced its ruling from the bench, finding the allegations in the petition true by a preponderance of the evidence and ordered that the children remain in the Department's care with placement to exclude Krystal's home. The court noted, based upon the exhibits offered, that the condition of the residence created "a clear and significant risk of harm to the minor children." The court specifically noted as a concern that one of the exhibits showed what appeared to be a prescription bottle with pills visible inside on a nightstand that would have been within reach of the children. The court also stated that it would issue a dispositional order, to include continued supervised visitation for Krystal, family support services, a co-occurring evaluation, random drug and alcohol testing, and completion of a psychological evaluation.

The court's findings were memorialized in a written order entered on January 5, 2023. In its written order, the court found the allegations of the petition to be true and determined, by a preponderance of the evidence, that the children came within the meaning of § 43-247(3)(a). The order further stated that "pursuant to the findings made previously herein and in order to remedy the conditions that brought this matter before the [c]ourt," Krystal should "comply with the plan designed to correct the conditions that brought this matter before the court." The court ordered that the children remain in the Department's care and custody for appropriate care and placement until further order of the court, ordered that Krystal participate in the services referenced in its findings from the bench, and scheduled the matter for further disposition on February 16. Finally, the court ordered that Ivy continue to receive mental health services as recommended, that a family group conference occur to address issues of permanency for her, and that the Department consider Ivy's aunt in North Carolina, who had previously been her guardian, for placement. Krystal subsequently perfected her appeal to this court.

ASSIGNMENTS OF ERROR

Krystal asserts that the juvenile court erred in finding sufficient evidence (1) that reasonable efforts were provided to prevent the removal of the children from her home as required by Neb. Rev. Stat. § 42-283.01 (Reissue 2016) and Neb. Rev. Stat. § 43-284 (Reissue 2016) and (2) that the children were at risk for harm and came within the meaning of § 43-247(3)(a).

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022).

ANALYSIS

*Reasonable Efforts.*

Krystal first assigns that the juvenile court erred in finding sufficient evidence that reasonable efforts were provided to prevent the removal of the children from her home as required by § 42-283.01 and § 43-284.

Section 43-284 allows a court to enter a dispositional order removing a juvenile from their home upon a written determination that "continuation in the home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts to preserve and reunify the family have been made if required under section 43-283.01." Section 43-283.01 provides, as relevant:

> (1) In determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern.
>
> (2) Except as provided in subsections (4) and (5) of this section, reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home.

Subsection (4) of § 43-283.01 lists exceptions to the requirement that the State provide reasonable efforts to preserve and reunify the family, but none of those exceptions are applicable in the present case.

The Nebraska Supreme Court has determined that the issue of reasonable efforts if required under § 43-283.01 must be reviewed by the juvenile court in the following situations: (1) when removing from the home a juvenile adjudged to be under § 43-247(3) and (4) pursuant to § 43-284; (2) when the court continues a juvenile's out-of-home placement pending adjudication pursuant to Neb. Rev. Stat. § 43-254 (Cum. Supp. 2022); (3) when the court reviews a juvenile's status and permanency planning pursuant to Neb. Rev. Stat. § 43-1315 (Reissue 2016); and (4) when termination of parental rights to a juvenile is sought by the State under Neb. Rev. Stat. § 43-292(6) (Reissue 2016). See, *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002); *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002).

In this case, the juvenile court's September 15, 2022, ex parte order stated that the children were seriously endangered in Krystal's residence, that their continuation there would be contrary to their health, safety, or welfare, and that immediate removal appeared necessary for their protection. The court also found that "[e]xigent circumstances exist based on the contents of the [State's supporting] affidavit." In its order following the September 2022 first appearance and detention/protective custody hearing, the court found that "reasonable efforts have been made to eliminate or prevent removal of the minor children from the parental home to include, but not be limited to an initial risk assessment" and that "due to exigent circumstances, it would be contrary to the health and safety of the minor children to be returned home at this time." Finally, in the dispositional portion of the court's January 2023 order, the court referenced "the findings made previously herein" as well as the need to "remedy the conditions that brought this matter before the [c]ourt" and found that Krystal should comply with the plan designed to correct those conditions. The court then ordered that the children remain in the Department's care and custody

for appropriate care and placement, until further order of the court, and it scheduled a continued disposition hearing.

Krystal argues that reasonable efforts were not provided to her before the decision to remove the children from her home was made. She notes her plan to stay with a friend and lack of evidence as to what specific shelter options were discussed by police officers and Krystal. She acknowledges the condition of her home at the time of the children's removal, but she argues that little effort was made to provide her with temporary housing resources or investigate her plans to leave the home and that the efforts that were made were not reasonable.

The State argues that findings with respect to reasonable efforts under § 43-283.01 are not required in adjudication orders. Here, however, the January 2023 order was both an adjudication and dispositional order. Assuming, without deciding, that the court must find reasonable efforts under such a situation, we find that the January 2023 order incorporating its previous findings constituted a finding that reasonable efforts had been made to preserve and reunify Krystal's family or eliminate the need for removing the children from her home or that exigent circumstances prevented the need for such reasonable efforts. Upon our de novo review, we find that this determination is supported by the evidence as to the condition of the residence upon investigation by law enforcement, the officers' discussion of shelter options with Krystal and her declining such options, Krystal's lack of definite plans as to how to resolve the situation, and the risk assessment done by the Department as noted by the court. We also note that in September 2022, the Department was ordered to provide Krystal with certain voluntary services, although the record does not include evidence about what services were in fact provided prior to the January 2023 adjudication and dispositional hearing. Viewed as a whole, the evidence establishes that exigent circumstances existed at the time the children were removed from Krystal's care and that appropriate reasonable efforts were made in light of those exigent circumstances. This assignment of error fails.

*Adjudication.*

Krystal asserts that the juvenile court erred in finding sufficient evidence that the children were at risk for harm and came within the meaning of § 43-247(3)(a). Upon our de novo review, we find no error in the court's decision adjudicating Krystal's children.

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). Section 43-247(3)(a) provides the juvenile court with jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." The purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Xandria P., supra.*

The Nebraska Juvenile Code does not require a juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. See *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021). While the State need not prove that the child has actually

suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *In re Interest of Draygon W. et al., supra*.

Here the undisputed evidence shows the extremely cluttered and unsanitary condition of Krystal's residence. The police officers described their observations of extensive trash, food debris, and other clutter. The kitchen counter did not appear to be accessible, and there was only a narrow path from one location to the next inside the residence. One officer observed fruit flies in several rooms. The multiple photographs received into evidence at the adjudication hearing support the officers' descriptions of the condition of the residence. The juvenile court took particular note of a photograph depicting a prescription pill bottle with pills visible inside on a nightstand where it would have been accessible to the children. Krystal points to the evidence that the children seemed happy and clean when contacted by police, that she had food and water in the residence, and that she had plans to stay somewhere else that night. However, even though Krystal's children had not been harmed up to that point, a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). In light of the evidence showing the condition of Krystal's residence, the juvenile court did not err in adjudicating the children as juveniles within the meaning of § 43-247(3)(a). There was sufficient evidence presented to show that that the children were at risk of harm due to Krystal's faults or habits.

CONCLUSION

We affirm the juvenile court's order adjudicating the children as within the meaning of § 43-247(3)(a). Krystal was provided with reasonable efforts to keep the children in her home prior to their removal by the State, and there was sufficient evidence to demonstrate the children were at risk for harm.

AFFIRMED.