IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LONDYN H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LONDYN H., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARIO O., APPELLANT.

Filed September 12, 2023.    No. A-23-150.

Appeal from the County Court for Saunders County: ANDREW R. LANGE, Judge. Affirmed.

Mark A. Steele, of Steele Law Office, for appellant.

Jennifer D. Joakim, Saunders County Attorney, for appellee.

Catrina K. Harris, of Lutton Law Office, L.L.C., guardian ad litem.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## INTRODUCTION

Mario O. appeals from the order of Saunders County Court, sitting as a juvenile court, which adjudicated his minor child, Londyn H., under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). He argues that the juvenile court erred in its determination that he had failed to provide proper parental care and abandoned the child. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

Mario is the biological father of Londyn, born in July 2014. Londyn was removed from the care of her biological mother in April 2019 due to concerns regarding the mother's drug use. Though an original petition relating to the mother is not included in our record on appeal, the

Nebraska Department of Health and Human Services' (the Department's) case plan dated March 23, 2022, states that Londyn was made a ward of the state shortly after her removal, and Londyn was adjudicated on August 5, 2019. Londyn's mother is not involved in this appeal and will be discussed only as necessary to its resolution.

On January 10, 2023, the State filed a supplemental petition in the juvenile court, alleging that Londyn was within the meaning of § 43-247(3)(a). Specifically, the State alleged that Londyn lacked proper parental care due to Mario's fault or habits and was at risk for harm because Mario was unable or unwilling to be involved in the child's daily life and to be a constant, full-time parent, and failed to "sufficient discharge" his duty to exhibit a continued interest in the child, including financial and emotional support, and parental affiliation with the child, thereby abandoning the child within the meaning of § 43-247 (3)(a). Mario entered a denial to the allegation of the petition, and an adjudication hearing was held on January 25, 2023. The following evidence was adduced.

Mario testified that he and Londyn's mother coparented Londyn in Nebraska from her birth in 2014 until 2016. In 2016, Mario and Londyn moved to Florida where they resided for 1 year until Mario moved to Trinidad to attend a master's program and Londyn returned to Nebraska to live with her mother. After Mario completed his master's program, he moved back to Nebraska and resumed coparenting Londyn.

A certified child support payment history was entered into evidence, reflecting that Mario paid a monthly obligation of $154 beginning in September 2015. Mario's child support payments were suspended in May 2017 because Londyn was residing with Mario in Florida at that time. Mario had no payments in arrears and no subsequent child support order has been made.

On December 21, 2018, Londyn's mother obtained an ex parte domestic abuse protection order in the district court of Saunders County against Mario on behalf of Londyn. In the accompanying affidavit, Londyn's mother stated that Mario had yelled at Londyn to brush her teeth, drug Londyn by her arm about 10 feet, and "smacked" Londyn's buttocks and thighs. The ex parte order awarded temporary custody of Londyn to her mother and excluded Mario from the mother's residence, but did not prohibit Mario from contacting or communicating with Londyn. Mario requested a hearing on the protection order, but the request was denied by the district court because it was untimely made.

In September 2019, Londyn's mother filed a motion to vacate and set aside the domestic abuse protection order, stating in her motion that Londyn's father was no longer a danger to her. During a hearing on the mother's motion to vacate, the mother withdrew her motion and the protection order remained in effect until December 2019.

The Department's March 2022 case plan also stated that because Mario had hit Londyn, he was arrested on December 21, 2018, and "[t]here was also a no contact order in place through Saunders County." However, the criminal case against Mario and the no contact order were dropped in September 2019.

In April 2019, Londyn was removed from her mother's care and Mario did not receive legal notice of the removal. Mario moved to Florida in late 2019. Since the juvenile case began, Londyn has never been placed with Mario. There is little information included in our record regarding Mario's involvement in the juvenile case from the time of Londyn's removal in April 2019 until the spring of 2022, when the Department first created a case plan for Mario.

- 2 -

Though our record does not contain a transcript from any hearing prior to the filing of the supplemental petition, Mario concedes that the juvenile court adopted the Department's March 23, 2022, and October 4 case plans. Mario's original goals, included in the March 2022 case plan, were to maintain consistent contact with Londyn through virtual visitation and phone calls and to complete an Interstate Compact on the Placement of Children (ICPC) home study to explore Londyn's placement with Mario.

Deidre Shafer, the family's caseworker since April 2021, facilitated Mario's virtual visitation beginning in March 2022. The Department offered at least 2 hours per week of virtual visitation supervised by a family support worker, and Mario was also allowed to call Londyn at her placement at any time. When Mario was participating in virtual visitation, he would occasionally not answer the video call. The October 2022, case plan notes that of the 11 supervised visits offered to Mario between March and May, he attended eight. When visits did occur, Londyn was engaged, and the visits went well.

Lora, Londyn's maternal grandmother, has had placement of Londyn since December 2021. When video visitation did not occur, Londyn would become upset and withdrawn and ask Lora why Mario and his family did not want to speak with her. Lora began not telling Londyn about virtual visits to avoid Londyn becoming upset if the visits did not happen as scheduled.

Tracy Strong was the family support worker who supervised Londyn and Mario's virtual visits. Text messages exchanged between Strong and Mario from April to June 2022 and November to December were entered into evidence. On May 10, Mario did not attend a visit and informed Strong the following day that he was ill and the visit "slipped [his] mind." That same day, May 11, Strong offered a visit later in the week where Mario would be able to watch Londyn's T-ball practice. Mario did not respond despite Strong sending follow up text messages on May 12 and 13. Mario and Strong resumed communicating about visits from June 10 to 13, and a virtual visit was scheduled for the evening of June 13 but ultimately it did not occur. Strong sent messages on June 14, 15, and 21, asking if Mario wanted a visit without receiving any response from Mario.

The next text message from Strong to Mario was sent on November 4, 2022. Strong testified that the gap in text messages from late June until early November likely reflects the expiration of the previous referral for supervised virtual visits and the Department creating a new referral. Strong and Mario exchanged messages from November 4 to December 8, but no visits were scheduled. Instead, Mario communicated his frustrations regarding the juvenile case to Strong.

On November 6, 2022, Mario sent a text message to Strong stating, "[i]t's my job as a parent not to let anyone unlawfully take my child and then submit to demands just to reunify with my child." Strong responded that she would want to visit with her child as often as possible and observed that the situation was most unfortunate for Londyn, and Mario did not reply. In another text message, on November 14, Mario told Strong that he has "custodial rights to my biological child that are being completely ignored . . . please stop trying to coheres [sic] me [into attending visits]." After Strong sent Mario three text messages offering virtual visitation on November 23, December 1, and December 8, Mario messaged Strong on December 8, "this is harassment."

Strong testified that the Department's most recent referral instructs family support to continue reaching out to Mario weekly until the end of March 2023. Strong has not received a

response since November 2022. Strong has not supervised a virtual visit between Londyn and Mario since the spring of 2022.

Lora testified to communications Mario had with Londyn outside of virtual visits through the Department. Lora recalled a phone call Mario made to Londyn in the summer of 2022, the day after her birthday, as well as three text message exchanges between Mario and Londyn in August, November, and December. Screenshots of the text messages were entered into evidence. In the text messages, Mario discusses Londyn moving to Florida, statements made in court, and how Mario was going to "win" the juvenile case. Mario also placed eight video calls to Londyn in July and August, though it is unclear from our record whether these calls were answered and how long they lasted. Shafer was concerned about Mario having inappropriate conversations with Londyn, specifically talking with Londyn about moving to Florida when her change of placement had not yet been approved by the Department or juvenile court.

The March 2022 case plan reflects Mario's resistance to participating in a prior ICPC. The case plan states that in March 2020, an ICPC request was sent to Florida and Mario refused to participate because he did not need to prove his home was safe for Londyn as there were no allegations against him in the juvenile case at that time. Due to Mario's lack of cooperation, this prior ICPC was denied by the state of Florida. The second ICPC was completed by Florida social services in August 2022.

Shafer testified that Londyn is currently seeing a therapist due to trauma caused by witnessing domestic violence in the home and her removal, and has been diagnosed with generalized anxiety disorder. Londyn's therapist recommended that Mario attend 10 sessions of individual therapy and then participate in family therapy with Londyn to help manage Londyn's anxiety. The family therapy recommendation was also made to help Mario understand how his inconsistency affects Londyn. The October 2022 case plan details a report from Londyn's therapist in which she states that Londyn "is increasingly hurt by the lack of parental involvement followed by promises to reconnect with either parent." Londyn also had been exhibiting negative behaviors and making suicidal statements in school. The therapist attributed this to Londyn's "constant frustration of attempting to regulate her parents."

In the October 2022 case plan, Shafer included a third goal for Mario; to enhance Mario's parenting skills by attending supervised visitation, and participating in virtual family support services, a parenting class, individual therapy, and a parenting assessment. Shafer added the items to the case plan after speaking with Londyn's therapist and guardian ad litem and developing a transition plan to prepare Mario for possible placement of Londyn. Shafer believed this transition plan was in Londyn's best interests. As of trial, Mario had not participated in family support or a parenting class, despite referrals being made for the services. Shafer asked Mario for an update on individual therapy and the parenting assessment and did not receive a response.

Shafer described Mario's contact with Londyn as minimal. Mario told Shafer that the reason he was not participating in supervised visitation or family support services was because the ICPC had been approved and he did not feel he needed to participate in any further services. Mario also testified that due to the approval of his ICPC application, he had moved the juvenile court to dismiss the matter or transfer jurisdiction to Florida. This motion does not appear in our record on appeal. Mario testified that he would be able to provide a safe and secure home for Londyn and

that having placement of Londyn would be in the child's best interests. Mario stated that he has been prohibited from having contact with Londyn due to the pending juvenile case.

Mario acknowledged that even with the suspension of the previous child support order, he should still financially support Londyn. However, Mario stated that he was told by the Department to stop sending Londyn money directly. Mario has purchased clothing and gifts for Londyn but has kept the items in his home rather than send the items to her. Lora testified that she had received no gifts for Londyn on behalf of Mario and Shafer was not aware of Mario giving gifts or providing any financial support to Londyn's care.

Lora testified that since December 2021, Mario has not had an in person visit with Londyn despite being in Lincoln, Nebraska, a few weeks prior to attend the hearing on the supplemental petition. Mario testified that though he had considered reaching out to Londyn when he was in Nebraska, he did not, because of his flight arrangements and the amount of travel time from Lincoln to Wahoo, Nebraska, compared to the short amount of time he would be in the state. Additionally, Mario does not trust the Department because he has "watched things happen that's not reported," and so was skeptical about the Department supervising his in person visit with Londyn. Mario did not contact Lora or Londyn while he was in Nebraska.

Shafer concluded that Mario was unable or unwilling to participate in the case plan and that the Department could not recommend reunifying Mario with Londyn due to his lack of case participation. Based on Shafer's interactions with Mario since she became the family's caseworker, she did not believe that Mario's level of participation in the case would change.

Mario testified that he has told the Department that they "had no legal reason to be able to tell me to do anything . . ." Mario also described himself as actively involved with the juvenile case. Mario stated that only his skepticism toward the Department was preventing him from contacting Londyn daily. When asked if he had been acting like a full-time parent, Mario responded that he had been "prohibited from being a full-time parent."

In an order filed on January 26, 2023, the juvenile court found the allegation of the supplemental petition to be true and determined, by a preponderance of the evidence, that Londyn and Mario came within the meaning of § 43-247(3)(a) and under the jurisdiction of the court.

Mario appeals.

ASSIGNMENT OF ERROR

Mario assigns that the juvenile court erred in finding that he had failed to provide parental support and affiliation for Londyn, and thereby conferring jurisdiction over Mario and Londyn.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

ANALYSIS

Mario asserts that the juvenile court erred in finding that he had abandoned Londyn within the meaning of § 43-247(3)(a). Mario also contends that the juvenile court erred by conferring its jurisdiction over him and Londyn. As a part of this assigned error, Mario contends that he was the nonoffending parent in connection with the original adjudication of Londyn in her mother's case.

To obtain jurisdiction over a juvenile and the juvenile's parents, the court's only concern is whether the condition in which the juvenile presently finds himself or herself fits within the asserted subsection of § 43-247. *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020). The rights of parenthood, even of a fit parent, are not beyond limitation by the State's powers and duties as parens patriae. *Id*. The nonoffending parent's exercise of the parental preference of custody is not entirely unfettered during the juvenile court's continuing jurisdiction under the juvenile code. *Id*. The juvenile court, in the exercise of its parens patriae responsibilities, may develop a transition plan constituting a reasonable intrusion of limited duration into the nonoffending parent's rights to autonomy in the care and custody of the child. *Id*.

Though Mario was the nonoffending parent at the time Londyn was adjudicated under the original petition relating to her mother, the juvenile court properly ordered Mario to comply with the transition plan created by the Department in tandem with Londyn's therapist and guardian ad litem. Mario was ordered to attend supervised virtual visitation and to participate in family support services, a parenting class, individual therapy, and a parenting assessment. Mario largely failed to participate in any of these services other than attending virtual visitation, which he attended from March to May 2022.

Mario's communications with Londyn have been inconsistent throughout 2022. Mario attended eight of the 11 offered supervised virtual visits in the spring of 2022 but did not respond to the family support worker's repeated attempts to schedule virtual visits throughout the remainder of the year. Mario's text messages to the family support worker are hostile and defensive, despite the worker's suggestion that Londyn would be negatively affected by Mario's refusal to attend virtual visitation. Mario called Londyn through her placement once in the summer of 2022. Mario also text messaged with Londyn directly in August, November, and December, and placed eight video calls to her cell phone in July and August. Many of Mario's text messages to Londyn discussed the juvenile case.

Mario's indifference to Londyn was particularly apparent when Mario did not see Londyn in January 2023 when he traveled from Florida to Lincoln, Nebraska, to attend the hearing on the supplemental petition. Mario testified that he did not arrange for an in person visit with Londyn because he would not be in the state for very long and he would have had to travel from Lincoln to Wahoo, which is a distance of less than 35 miles. Not only did Mario not visit Londyn at her placement, but he did not make arrangements with Lora or Shafer to have Londyn brought to Lincoln so that he could see Londyn after the hearing. Mario had not seen his daughter in person since December 2021.

Section 43-247(3)(a) provides the juvenile court with jurisdiction over any juvenile "who is abandoned by his or her parent, guardian, or custodian"; and "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a

minimum, the State must establish that without intervention, there is a definite risk of future harm. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). The State must prove such allegations by a preponderance of the evidence. *Id*.

In Nebraska, the rights of the parent and the child are protected by the separate adjudication and dispositional phases of the dependency proceeding. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). A petition brought under § 43-247(3)(a) is brought on behalf of the child, not to punish the parents. The purpose of the adjudication phase of the proceeding is to protect the interests of the child; the purpose of the dispositional phase is to determine placement and the rights of the parties in the action. *Id*. It is not improper for the court to sustain jurisdiction at the adjudication phase if the State establishes a lack of proper parental care in the child's present living situation. *Id*.

Here, the grounds alleged in the supplemental petition, which the juvenile court found were proved by sufficient evidence, included that Londyn lacked proper parental care due to Mario's fault or habits as Mario was unable or unwilling to be involved in the child's daily life and to be a constant, full-time parent, and fails to "sufficient[ly] discharge" his duty to exhibit a continued interest in the child; thereby abandoning Londyn and placing her at risk for harm. Mario argues that his communication with Londyn and efforts to have her placed with him demonstrates his intent to parent Londyn, and the State failed to show that his actions placed Londyn at risk of harm. We disagree.

As we have discussed above, Mario has been inconsistent with his communication with Londyn. This inconsistency has greatly impacted Londyn's mental health. When Mario did not attend virtual visitation, Londyn was saddened to the point that Lora stopped telling Londyn when visitation was scheduled to occur in case the visits did not take place. Londyn's therapist has reported to the Department that Londyn is hurt by the lack of parental involvement in her life and that Mario's inconsistency has led to Londyn's negative behaviors and making suicidal statements at the age of 8. The recommendation by Londyn's therapist that Mario participate in individual therapy and later family therapy was made so that Mario would be equipped to support Londyn's generalized anxiety disorder. Not only has Mario been contributing to Londyn's distress through his lack of contact, but Mario also refused to participate in a service designed to ameliorate Londyn's mental health diagnoses. This places Londyn at risk of harm.

Finally, although the evidence shows that Mario has been a part of Londyn's life in some respect, he has not provided the consistent care and support of a parent. Throughout the case Mario has blamed the Department and the juvenile court for not allowing him to act as a full-time parent to Londyn. However, it is Mario who is not consistently communicating with his daughter or participating in court-ordered services for her benefit. After a de novo review of the record, we find that the evidence shows by a preponderance that Mario has abandoned Londyn for the purpose of § 43–247(3)(a) in failing to provide Londyn with proper support and parental care and that the juvenile court did not err in adjudicating Londyn under that statute.

CONCLUSION

Upon our de novo review of the evidence, we find that the State proved the allegations in the supplemental petition by a preponderance of the evidence. Accordingly, the juvenile court properly took jurisdiction over Londyn and Mario.

AFFIRMED.