IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF PAISLEE K. & JAYDEN K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF PAISLEE K. & JAYDEN K., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JUSTIN M., APPELLANT.

Filed March 12, 2024.    No. A-23-459.

Appeal from the Separate Juvenile Court of Sarpy County: SARAH M. MOORE, Judge. Affirmed.

Katrine M. Herrboldt, for appellant.

Brianna McLarty, Deputy Sarpy County Attorney, and Shelbe Stroh and Leighandra Hazlett, Senior Certified Law Students, for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Justin M. appeals from the order of the separate juvenile court of Sarpy County, which adjudicated two of his minor children under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). He argues that the juvenile court erred in finding sufficient evidence as to each of the allegations of the operative petition and determining that the children were within the meaning of § 43-247(3)(a). He also argues that the court failed to recognize a conflict of interest requiring recusal. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. Parties, Paternity Action, and Juvenile Court Pleadings

#### (a) The Parties

Justin M. and Samantha K. are the parents of Paislee K., born in August 2019, and Jayden K., born in January 2021. We have referred to Paislee and Jayden collectively as "the children." Justin also has another minor child, Layla M. Layla's mother is Caitlyn T. Layla was removed from Justin's care at some point, and a separate juvenile court case was initiated with respect to her. Justin has never been married to either Samantha or Caitlyn. Samantha, Caitlyn, and Layla are not part of the present appeal, and we refer to them only as necessary to the resolution of Justin's appeal.

#### (b) Paternity Action

In November 2019, the State filed a paternity action against Justin in the district court for Douglas County, seeking to establish child support on behalf of Paislee. Subsequently, Samantha was added as a third party defendant, and the State filed an amended complaint to add Jayden after his birth.

Several temporary orders were entered in the paternity case. In April 2020, the parties agreed to a joint legal and physical custody arrangement regarding Paislee and that no child support would be paid by either party. In January 2022, a second temporary order added Jayden, and the parties agreed to the same custody arrangement and that no child support would be paid. On August 2, the district court ordered Justin to pay temporary child support of $500 per month for two children beginning August 1. This was a downward deviation from the child support amount of $676 calculated by the court because the parenting order in place at that time called for the parties to have joint physical custody, "despite the fact that [Justin] disclosed to the [district court] that he had not been exercising that time the previous 6 months."

On October 19, 2022, the district court entered a decree of paternity, awarding Samantha legal and physical custody of the children subject to Justin's parenting time. The court ordered Justin to pay child support of $608 per month for two children and $417 per month for one child. Pursuant to the parenting plan, Justin was awarded regular parenting time every other weekend from Friday after school (or 6 p.m. if the children were not in school) until Sunday at 6 p.m. and every Wednesday evening from the when the children were released from school (or 6 p.m.) until 8 p.m. The parenting plan also set forth a schedule for holiday and summer parenting time.

#### (c) Juvenile Court Pleadings

The children were removed from Samantha's care in October 2022 and placed in the custody of the Nebraska Department of Health and Human Services (the Department) due to concerns about Samantha's use of methamphetamine.

On October 19, 2022, (the same date that the paternity decree was entered in district court), the State filed a supplemental petition in the juvenile court, setting forth allegations as to Justin. In the operative juvenile petition filed on May 12, 2023, the State specifically alleged that the children were within the meaning of § 43-247(3)(a) and at risk for harm due to Justin's use of alcohol and/or his unlawful use of prescription drugs; his failure to exercise consistent visitation;

his failure to provide the children with proper care, supervision, support, and/or safety; his failure to provide the children with safe, stable, and/or appropriate housing; and his prior conviction of false imprisonment of a domestic partner.

## 2. ADJUDICATION HEARING

An adjudication hearing was held before the juvenile court on May 15 and 18, 2023. The court heard testimony from Justin, Samantha, Samantha's former stepmother, several of the Department case workers, a drug testing supervisor, a family support worker, and the therapist who conducted a co-occurring evaluation of Justin. The court also received various exhibits, including drug test results, visitation notes, the paternity decree and the August 2022 temporary order in the district court proceedings, documentation of Justin's child support payment history, documentation of Justin's 2015 plea-based conviction of second degree false imprisonment and interference with a public service company, Justin's co-occurring evaluation, and a forensic interview of Layla.

During the course of the adjudication hearing, the juvenile court noted on the record its review of the court file and the absence of an agreement between the parties on the issue of voluntary services. Based upon the court's statement and an email communication the court had sent to the parties between the two days of the hearing, Justin's attorney asked the court to recuse itself, which it declined to do. We have set forth further details about this issue in the analysis section below.

### (a) Department's Initial Investigation

Department case worker Maya Reed-Bouley received an intake regarding Samantha and the children in October 2022. Reed-Bouley interviewed Samantha on October 19. According to Reed-Bouley, Samantha reported that she had just gained custody of the children and that the judge in the paternity case had stated Justin "was unfit to be a parent." Samantha also reported concerns about Justin's drinking and threats to kill himself, allegedly made while he was intoxicated and in the presence of the children and also made on voicemails. Samantha reported that Justin would "drink five to six shooters as well as a 40-ounce can of beer nightly to the point of blacking out," and she told Reed-Bouley that Justin was making statements about not loving the children and not wanting them. Reed-Bouley interviewed Amy W., Samantha's former stepmother, who also reported concerns about Justin's alcohol use and that she "had voicemails of him threatening to kill himself while intoxicated."

After the children were removed from Samantha's care, Reed-Bouley made contact with Justin on October 20, 2022, to evaluate his suitability as a possible placement for the children. Reed-Bouley testified that since Justin expressed interest in placement of the children, she arranged for a walk-through that day of the residence where Justin resided with his parents and Layla. The walk-through was also attended by Reed-Bouley's Department supervisor, Audrey Stevenson. Justin expressed concern about Samantha's methamphetamine use, and Reed-Bouley identified Justin's concern about Samantha's drug use and "what was going on" as a "strength" for him. She was concerned by Justin's report of taking Paislee and driving off with her to help Samantha "get sober" when Samantha was leaving the hospital after Paislee's birth as there was no formal custody arrangement at that time.

During the walk-through of the residence, Reed-Bouley did not note any issues with respect to cleanliness, and she did not recall there having been any unsafe objects within a child's reach. She was concerned by Justin's statement that he was "staying in the bedroom downstairs" and that Layla was "sleeping on the couch." Reed-Bouley observed alcohol bottles and cigarettes in a bucket on the front porch. Reed-Bouley confirmed that she had no knowledge of who consumed the alcohol from those bottles, whether the alcohol was consumed on the premises, when the alcohol was consumed, or how much was consumed at any given point.

Reed-Bouley testified to a "major concern" that Justin would not let her and Stevenson into the garage (a location where Caitlyn had reported that Justin kept alcohol and smoked marijuana with his mother). Justin informed them that his mother was the only one with a key to the garage. After Reed-Bouley and Stevenson left the residence, Justin contacted Reed-Bouley to say that his mother and Layla had returned home from a doctor's appointment and that the garage was available for a walk-through. Reed-Bouley did not return that day to view the garage, but she was concerned about the timing of Justin's call at 3:17 p.m. because he had told her earlier that Layla got out of school at 3:10 p.m. and that the appointment was in Omaha at 3:15 p.m. Reed-Bouley agreed that she had no actual evidence that there was anything in the garage on the day of the walk-through that posed a risk for harm to a child. Reed-Bouley noted that despite visible evidence of Justin's father residing in the house, Justin initially stated that he, his mother, his brother, and Layla were the individuals living there. Reed-Bouley explained that it is a concern any time a client attempts to lie to a worker, "especially when dealing with where a child is placed." Reed-Bouley felt that Justin had omitted the information about his father living in the residence because of allegations that his father had had "inappropriate" or "sexual" contact with another child.

Reed-Bouley testified that after speaking with Justin and completing the walk-through, the Department felt it would be unsafe for the children to reside in the home with Justin. She expressed her concern that Justin had not been providing care for the children at the time of their removal from Samanatha, and she believed that it would cause the children "more harm," that they would "fall behind developmentally," or that they would hear "some of the statements that had been reported by multiple people that were not appropriate for children to hear" if placed with Justin. Reed-Bouley believed the children would be at risk of harm if placed with Justin due to reports of him drinking "to the point of blacking out while supervising children," the children's young age, and it being inappropriate to place children "if there are concerns of any sort of sexual assault or any sort of inappropriate contact with minors."

Stevenson's testimony about the initial walk-through was consistent with Reed-Bouley's. Stevenson returned to the residence the following day for a walk-through of the detached garage; she also viewed the living room and kitchen of the residence on that occasion. In the garage, Stevenson observed "two bottles [sic] boxes of empty 40-ounce cans of Busch Light." In the kitchen, Stevenson noted "several bottles" of medication on top of the refrigerator that "wasn't properly stored away," and the Department later asked that this medication be stored more securely. Upon a return visit during a family team meeting in December 2022, Stevenson did not observe any issues with the condition of the residence.

Stevenson also testified about other issues, including Justin's compliance with the child support ordered in the paternity case. Stevenson testified that Justin began paying child support in December 2022 via an automatic payment. Her concerns with respect to Justin included her

impression that he had not been providing any of the care for Layla, his lack of participation in Layla's educational needs "outside of the required paperwork," Justin's lack of follow through with some of the services recommended by the Department, his failure to participate in visitation "on a regular basis," and Justin's mental health. Stevenson noted that Justin had stopped testing after receiving positive drug and alcohol test results in November 2022, although she thought Justin had provided Reed-Bouley with a picture of an expired prescription for oxycodone after receiving the positive test results. Stevenson acknowledged that Justin had not been court ordered to participate in mental health services or to stop consuming alcohol; she acknowledged that when the children were removed from Samantha's care, they were adequately nourished and clothed; and she confirmed that Samantha and Caitlyn were the Department's initial sources of information regarding concerns about Justin.

(b) Layla's Removal and Forensic Interview

Following the October 20, 2022, walk-through of Justin's residence, the Department initiated an investigation with respect to Layla. Reed-Bouley researched the sex offender registry and did not find any of the household family members on the registry; however, information she received in the investigation with respect to Layla indicated Layla had difficulty and educational delays while enrolled in public school, at least in part, because of virtual access to her classes initiated during to COVID-19 pandemic. Layla had been transferred by "the grandparents or [Justin]" to a private school, which provided in-person schooling during the pandemic.

We have reviewed the forensic interview of Layla conducted on October 27, 2022, after her removal from Justin's care; she was 8 years old at the time of the interview. Layla confirmed that Justin drinks and smokes (she appeared to describe regular cigarettes). She does not like it that he leaves alcohol containers and cigarette butts in the yard because it is "littering." She stated that he acts "the same" and does not say "anything" when he drinks. Layla also stated that she does not like it that he calls her "stupid."

Tyler Kohl, the ongoing Department case worker assigned to the children in this case as well as to Layla's case, testified to a conversation in March 2023 with Layla about her concerns. According to Kohl, Layla told him that she did not like how it made her feel when Justin would "call her names or call her stupid" and that she did not like it when Justin drank. Kohl testified that when he asked Layla how Justin acted when he drank, she said "his face looks different and he's meaner." He testified that these were the only concerns Layla told him at that time.

(c) Testimony of Ongoing Department Case Worker

Kohl was assigned to the present case in December 2022. According to Kohl, Justin has participated in monthly contact with him since then. Services offered to Justin by the Department included supervised visitation between Justin and the children, drug testing, and a co-occurring evaluation. Kohl also referred Justin for a Circle of Security parenting class on two occasions; he was not sure whether the service provider for the class had reached out to Justin after the second referral. Kohl also noted that he contacted Justin by email about providing consent for an Individual Education Plan for Layla, after the school had been unsuccessful in multiple attempts to contact Justin and obtain his consent, and that Justin did then provide the requested consent.

Kohl testified about the voluntary drug and alcohol testing Justin participated in after the children's removal. Kohl spoke with Justin about the positive drug test results for oxycodone, which Justin attributed to medication prescribed by a dentist. Kohl testified that Justin never provided a copy of the prescription; he did not recall whether he asked Justin to do so, although he told Justin he should give a copy to the service provider if he wanted the prescription "noted on the testing." Kohl never investigated whether Justin had any drug-related criminal charges and was unaware of Justin having any alcohol-related convictions.

Kohl noted that the co-occurring evaluation had been recommended for Justin based on the Department's concerns about his alcohol use and possible suicidal ideations. Kohl included unsubstantiated allegations from different people in the collateral information provided to the evaluator conducting Justin's co-occurring evaluation. Although the evaluation recommended Justin participate in a support group such as AA, individual therapy, and continue drug testing, Kohl was not aware if Justin was participating in any outpatient treatment, therapy, or other support groups at the time of the adjudication hearing.

With respect to visitation services, Kohl noted that the previous service provider (from November 2022 to February 2023) was falsifying documentation. Kohl agreed that Justin was "pretty up front" with him about how his work schedule might affect visitation. Aside from some canceled visits, Kohl had no concerns regarding Justin's visitation, and Kohl had authorized visits to occur in Justin's residence shortly before the adjudication hearing. Kohl noted that Justin's parents had not been authorized to attend visits because of the Department's concern that they had done the majority of the parenting for him; Kohl did not have any safety concerns based on the grandparents' having shown up briefly during a couple of visits. Kohl was concerned about Justin leaving visits early, testifying that Justin had "not completed a full allowed time visit." Kohl had previously been concerned about Justin cancelling visits, but he testified that Justin had not done so for "a few weeks." Kohl did not recall Justin having cancelled a visit for reasons other than his work.

Kohl did a walk-through of Justin's residence in March 2023. Kohl observed a crate of empty beer cans in the garage, which Justin explained had been set aside for recycling. In Justin's room, Kohl observed cigarette butts, four empty beer cans, and some prescription medication for Caitlyn; Justin denied being in a current relationship with Caitlyn, stating that the medication had been left in his room previously. Kohl observed a conversation between Justin and his mother, during which Justin told her that he would stop smoking in the basement of the residence where his room was located. When Kohl revisited the residence a week prior to his testimony, he did not note any of the concerns he previously observed.

Kohl believed that Justin would not be a safe and appropriate parent for the children based on Justin not alleviating "any of the previous safety threats that were identified at the time of removal." Initially, Kohl testified that he could not recall the specific safety threats, since he was not the case worker at the time of removal, but upon further inquiry, he testified that Justin had not alleviated concerns about his alcohol use, his mental health, and the level of parental care being provided for the children by him. Kohl affirmed that one of his concerns was that Justin was not participating in the voluntary services being provided to him.

(d) Drug Test Results and Co-Occurring Evaluation

Urinalysis drug and alcohol tests were administered to Justin on November 5 and 11, 2022. The November 5 test was positive for alcohol and oxycodone; the November 11 test was positive for oxycodone. Sarah Valentine, a supervisor with the drug testing service provider, testified about Justin's drug testing. The service provider did not have a record of any prescriptions on file for Justin, but Valentine acknowledged that Justin could have provided a prescription that was not documented.

LaRhonda Flowers, a licensed mental health therapist, testified about the co-occurring evaluation interview she conducted of Justin on December 8, 2022. Flowers' evaluation report, dated March 29, 2023, was admitted into evidence. The evaluation reflects diagnoses of mild alcohol use disorder and adjustment disorder with mixed anxiety and depressed mood. Following her interview and testing of Justin and based on the collateral information Flowers received, as well as her perception of Justin "not speaking the truth on his use of alcohol," Flowers recommended that he participate in "ASAM Level 2.1 Intensive Outpatient Group Treatment."

In her report, Flowers noted Justin's self-report of having used oxycodone "ten days in the past 30 days." Flowers testified that Justin reported using oxycodone that had been prescribed because he had "issues with his teeth" but that the prescription was "three months expired." Flowers had no information as to whether Justin was incapacitated when he was using oxycodone.

Flowers acknowledged conflicting statements within her report (Justin reported "experiencing trouble controlling violent behavior including episodes of rage or violence in his lifetime" but also, "despite his alcohol or drug use, denied ever experiencing trouble controlling violent behavior and . . . any suicide [sic] ideation in the past 30 days"). Flowers was asked about other discrepancies in her report (references to "Mr." with no last name attached and to "her" and "she"), which she indicated resulted from her use of a template for her reports and from hurrying to complete the report for which she had not yet been compensated.

Flowers confirmed that Justin's test scores on the Substance Abuse Subtle Screening Inventory she administered indicated that he had a low probability of having a substance use disorder with 92-percent accuracy. We note that her report on that test result also indicated that Justin "scored a 2 in RAP, which indicates some discrepancies in the self-report assessment." Flowers agreed that the consumption of alcohol by an individual does not necessarily indicate that there is "an alcohol problem."

Flowers did not recall being provided with information about Justin regularly consuming alcohol in excess, any harm to a child in Justin's care when he consumed alcohol, or his consumption specifically affecting his children. She did not recall any discussion with Justin about substance abuse interfering with his obligations at work or home or with his social or recreational activities. And, she did not recall receiving any information regarding drug or alcohol related criminal convictions or charges for Justin.

(e) Criminal Conviction

Records from the county court for Sarpy County admitted into evidence show that Justin was charged in November 2015 with first degree false imprisonment, a Class IIIA felony; the victim was Caitlyn. Pursuant to an amended complaint, he was charged with second degree false imprisonment, a Class I misdemeanor, and interfering with a public service company, a Class II

misdemeanor. Justin pled guilty to the charges of the amended complaint and was sentenced to 12 months' probation. Conditions of his probation included that he abstain from the use or possession of alcohol or controlled substances (except by prescription), submit to random chemical testing, submit to a chemical dependency evaluation and follow the treatment recommendations, and attend AA/NA meetings as recommended by the treatment provider or specified by his probation officer. There is no testimony in the record about Justin's compliance with these conditions.

### (f) Testimony of Family Support Worker

Family support worker, Joseph Gores, supervised approximately six 3-hour visits between Justin and the children in March and April 2023. Gores recalled two cancelled visits for Justin, one due to miscommunication as to scheduling and one due to a conflict with Justin's work. Gores also had a "vague recollection" of visits ending early on a couple of occasions. Gores did not recall the specific reasons, other than one visit ending early due to adverse weather conditions. Gores recalled grandparents, who were not approved to attend visits, stopping by briefly during two visits, and Justin asking them to leave, which they did. Gores did not observe any safety concerns with respect to the grandparents' brief interactions with the children; the only safety concern identified by Gores during his supervision of Justin's visits was an incident where one of the children "got a bump on the table," an issue Gores did not attribute to Justin. According to Gores, Justin provided appropriate meals, safe supervision, and diaper changes during the visits. Gores testified that he observed Justin and the children exchange hugs, hold hands, share meals, and talk, and he noted that Justin remained focused on interacting with the children. Gores also observed Justin provide supervision during the visits and assistance in returning the children to Gores' vehicle and securing them into their car seats at the end of the visits. Gores testified that the children appeared familiar and comfortable with Justin and that they referred to him as "Dad" during visits.

### (g) Testimony of Samantha and Former Stepmother

According to Samantha, she and Justin were in a relationship "[o]ff and on" for 3 or 4 years. They were not in a relationship at the time of Paislee's birth in August 2019, but Justin was at the hospital when Paislee was born. After Paislee's birth, Samanatha and Paislee resided with Amy until about November 2019. Samantha then went into "treatment," and Amy and Justin co-parented Paislee until January or February 2020. During this period, Paislee spent at least a few nights per week in Justin's care. After Samantha's treatment, she and Paislee resided together in "a transitional house for women and children" until May 2020. They then resided with Amy until Jayden's birth in January 2021. Samantha testified that Justin was not present for Jayden's birth but that he did visit the hospital following the birth. After Jayden's birth, Samantha and the children lived with Justin in an apartment for about a month. After that, they lived with Amy for a period of time and in other locations, until the children were removed from Samantha's care and placed with Amy on October 19, 2022.

Samantha testified about the environment during the month she and the children lived with Justin following Jayden's birth. According to Samantha, she decided to stop living with Justin because it was "just toxic" and they fought "over everything all the time." Samantha testified that the fights were "not necessarily" physical, but she testified that on the day she moved out, Justin

threw a handful of change at her while she was holding Paislee. She also testified that Justin threatened to harm himself on multiple occasions, although she did not have specific dates on which these threats of self-harm were made. She acknowledged that neither she nor Amy called the police in response to Justin's threats of self-harm. Samantha testified that Justin drank in front of her and the children, having "like a 40 of beer at least and then like about three to five little shooters," every night during the month they lived with him.

Samantha testified about her concerns with respect to Justin's parenting. According to Samantha, Justin would not see the children during periods that she was not in a relationship with him. She explained that Justin would ask to see the children sometimes, but that he "would never show up" when it was time for him to pick them up. She testified that while the children used to refer to Justin as "Dad," Paislee now refers to him as "Layla's dad." Samantha expressed concern about Justin's drinking, mental health, and nurturing ability because she had "never really seen him . . . really care about them." With respect to Justin's ability to parent the children, Samantha testified that he had "stated many times he wouldn't be able to handle it." Samantha also expressed concern about Justin's relationship with his mother, testifying about a screaming argument between Justin and his mother in December 2021 that occurred in the presence of her and the children. Samantha did not believe that the children had ever been in Justin's care when he had "possibly been drinking to excess." Samantha testified that she had on occasion sought assistance from Justin's parents in caring for the children and that she had no concerns about that being an unsafe environment for the children. However, she expressed concern that if Justin had "been in the home and drinking," his parents would not have been "protective of the children."

Samantha testified that prior to being ordered to pay child support, Justin did not do so, although she agreed that the children have always had a place to live and sufficient food and clothing. She also agreed that during the month she resided with Justin, Justin provided for the children. Samantha acknowledged receiving child support from Justin after entry of the paternity decree.

Amy testified about her interactions with Samantha and Justin at various points after Paislee's birth. Samantha contacted Amy after Paislee's birth because Justin, who was supposed to pick up both Samantha and Paislee from the hospital, took Paislee and left Samantha behind. After being contacted by Samantha, Amy picked Samantha up from the hospital, calmed Samantha, and had phone conversations with Justin, who expressed concern about Samantha's fitness to care for Paislee. Justin returned Paislee to Samantha's care after 24 hours.

According to Amy, between August and November 2019, Justin would visit Amy's residence to see Paislee, and Samantha would sometimes take Paislee to Justin's residence. Amy indicated that during the period she co-parented with Justin, the children spent 3 or 4 nights per week in his care. Amy testified that after Samantha was out of treatment and before Jayden's birth, Justin was at her residence "[v]ery seldom." And, she indicated that after Jayden's birth, Justin was never at her residence. In 2022, Amy never saw Justin at another house she owned while Samantha lived there or in the apartment Samantha lived in at one point.

Since the children's placement with her, Amy has supervised visits between Justin and the children on several occasions when visitation workers were not available. She testified that the visits she supervised all ended early because Justin had to go to work. Amy also testified about Justin's visitation consistency in general since the children's removal. According to Amy, visits

were supposed to occur from 10 a.m. to 3 p.m. on Saturdays and Sundays and visits "have never gone beyond three hours" until just before the termination hearing. Amy testified, however, that Justin "does okay with his children" and that he is "attempting to be a father to his children" during visits. Amy did not have to assist Justin with parenting during her supervision of visits. She acknowledged that Justin had contacted her to check on the children, and she had conversations with Justin about the children during several occasions when she supervised visits. On at least one occasion when agency visitation was cancelled, Justin took the initiative to try to coordinate a visit through Amy. Amy acknowledged Justin had also participated in some video call contact with the children. According to Amy, Justin has expressed support for reunification of the children with Samantha and has indicated he "wasn't fighting to get [the children] placed in his home."

Amy had known Justin since "right after" Paislee's birth. Amy, who is a former drug and alcohol counselor, had never seen Justin drink. Amy testified, however, to receiving numerous "angry" and "emotional" voicemails from Justin following Jayden's birth when Justin was trying to get ahold of Samantha, who was not answering her phone. Amy did contact law enforcement about the voicemails, making a report of "phone harassment," but she did not pursue any charges against Justin. Justin's conduct on the phone gave her the impression that he was impaired by drugs or alcohol. Amy acknowledged that the children were in her home asleep and not in Justin's care when she received the voicemails. Amy also testified that while Justin had never threatened self-harm on a phone call or voicemail to her, sometime between January and April 2022, Samantha played her voicemails from Justin, where he threatened to kill himself if Samantha did not return his call.

### (h) Justin's Testimony

Justin confirmed that he and Samantha had been in a relationship "off and on" for the previous 4 years. He testified about the incident when he took Paislee after her birth. According to Justin, he left the hospital with Paislee, Samantha, and Samantha's cousin, dropping Samantha off at her aunt's house and taking Paislee back to his residence. He testified that he took Paislee because he had received information from Samantha's family members that made him concerned for Paislee's welfare in Samantha's care. Justin's testimony about where Samantha and the children resided at different points conflicted with the testimony of Samantha and Amy. Justin denied any co-parenting with Amy, testifying that Paislee was with him "the first four months of her life," which he indicated was while Samantha was in treatment. According to Justin, Samantha entered treatment within a week of being released from the hospital, during which time Paislee resided with him in his parents' house. He testified that Paislee was with Samantha in the transitional house from approximately December 2019 to February 2020, after which they both resided with him at his parents' house until "[p]robably close to June." Justin testified that while Samantha and Paislee lived with him in his parents' house, Samantha was not working, and he provided basic needs such as diapers, food, formula for Paislee. After that, Justin was uncertain where Samantha and Paislee resided for periods of time due to his and Samantha's lack of communication during the paternity case, stating that he found out she was living with Amy "through the courts." He also stated that after leaving his parents' house, Samantha "lived with [him] too in the middle of it." He also indicated that Samantha did not consistently respond to his

requests for contact with Paislee, which irritated and concerned him, and that he went "months" without seeing Paislee due to Samantha's unresponsiveness.

Although Justin was unable to remember Jayden's birth date "off the top of [his] head," he testified that Jayden was 2 years old. Justin testified that Samantha and the children lived with him in an apartment for 5 or 6 months after Jayden's birth, after which Samantha stopped talking to him. Justin indicated that Samantha was not working while she and the children lived with him, and that she relied on him for housing, food and supplies for the children. Samantha told Justin she was going to Amy's when she moved out. Justin tried to be involved in Jayden's life once Samantha stopped talking to him, noting that he "got [himself] an attorney" and "got [Jayden] put into the court agreement."

Justin acknowledged his conviction for second-degree false imprisonment of Caitlyn when he was 19 years old. Justin admitted to "having love for" Caitlyn, but he denied being in a dating relationship with her since the children's removal. Caitlyn stayed at Justin's parent's house temporarily sometime within the last few months prior to the adjudication hearing while waiting to get into treatment. Layla had been removed from Justin's care by that point. Justin testified that he would protect the children in this case from Caitlyn if she were not "safe and sober," that he would not allow contact between Caitlyn and the children during his visits with them, and that he had never facilitated contact between Caitlyn and the children.

Justin acknowledged that he drinks, stating that he does so "one time a week maybe, sometimes not even that" and that the average number of beers he drinks at a time is one. He did admit to drinking shooters sometimes as well. He stated that his parents are usually present in the home when he has a beer in his room in the evenings. Justin denied drinking in front of Layla, consuming alcohol to excess when alone with "[his] child," or ever driving with "[his] child" after consuming alcohol. He also denied ever consuming alcohol to excess at a time when Paislee and Jayden were in his care or leaving them in Samantha's care when he had reason to believe she was under the influence of any substances. According to Justin, he usually places his cans in a bag and throws them away when he is finished with them. When asked about the beer cans observed during walk-throughs of his residence, he testified that his parents collect cans. Justin thought he was the only beer drinker in the house. Justin denied ever having had suicidal ideations, and he denied leaving voicemails to Samantha or Amy.

Justin admitted that he had utilized left over oxycodone prescribed by his dentist for tooth pain. Justin understood that he was to use the medication "as needed" for pain and testified to having ongoing dental issues over the previous 5 years. He denied ever taking more than the prescribed dose at any point in time or being impaired due to the prescription.

With respect to recommended services completed or attempted since the children's removal, Justin testified that he had just recently received the recommendations from the co-occurring evaluation, that he had "called to get stuff set up," and that he was "still on the waitlist." He acknowledged that treatment was recommended, but he did not think getting treatment was important because he does not believe he has an alcohol issue. Justin expressed his willingness to take the Circle of Security parenting class that had been offered to him. He testified that he had registered and taken one class, that his participation was interrupted by his on-call work schedule, and that he had not yet had a chance to reschedule. Justin did not identify his actual job; testimony from Amy indicates he is a plumber.

## 3. ADJUDICATION ORDER

On May 23, 2023, the juvenile court entered a detailed order in which it summarized the evidence and made numerous factual findings. The court concluded that each allegation of the operative petition was true by a preponderance of the evidence, and it adjudicated the children as juveniles within the meaning of § 43-247(3)(a). The court specifically found the testimony of the witnesses other than Justin to be probative, credible, and entitled to weight.

## III. ASSIGNMENTS OF ERROR

Justin asserts, consolidated and reordered, that the juvenile court erred in (1) not recognizing the appearance of a conflict of interest requiring recusal and (2) finding sufficient evidence that the children were at risk for harm and came within the meaning of § 43-247(3)(a).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022).

A motion to disqualify a trial judge on account of prejudice is addressed to the sound discretion of the trial court. *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019). An order overruling such a motion will be affirmed on appeal unless the record establishes bias or *prejudice* as a matter of law. *Id.*

## V. ANALYSIS

### 1. RECUSAL

Justin asserts the juvenile court erred in not recognizing the appearance of a conflict of interest requiring recusal. He argues that a potential appearance of impropriety was created when the court conducted an examination of the court file between the 2 days of the adjudication hearing and made certain determinations based upon its examination that were then communicated to the parties in an email and stated on the record by the court at the start of the second day of trial. We find no abuse of discretion in the court's denial of Justin's motion.

#### (a) Evidence Relevant to Recusal Issue

The relevance of Justin's participation in voluntary services for purposes of adjudication was first raised in a hearing on one of the amended petitions filed prior to the operative petition. During that hearing, Justin's attorney asked the juvenile court whether the court would consider Justin's participation in voluntary services relevant to adjudication. The court indicated that ruling on the issue at that time would be "premature," but that it would be something the court could rule on if evidence of Justin's participation in such services was presented at the time of the adjudication.

During the first day of the adjudication hearing, while cross-examining Kohl, Justin's attorney raised the issue of Justin's participation in voluntary services being "used against him" in the adjudication proceedings. At the conclusion of the hearing that day, the juvenile court had a

discussion with the parties' attorneys about the remaining evidence to be presented, noted that it had "some concerns about the preadjudicated services," but also stated that it would "leave that to the parties to determine what's relevant."

On May 16, 2023, between the two adjudication hearing dates, the juvenile court sent an email addressed to "all legal parties," which stated:

> I reviewed the Court file and there do not appear to be any written agreements by which the State agreed not to use [Justin's] participation in voluntary services against him. I will state this on the record when we convene [for the second day of the hearing], to clarify the Court's inquiry yesterday. I hope this clarification is helpful to all parties.

This email was admitted into evidence as an exhibit during the second day of the adjudication hearing.

At the start of the second day of the adjudication hearing, the juvenile court also provided clarification with respect to "a couple of questions" it had at the end of the previous hearing. The court noted that there had been "some talk between the parties with regard to voluntary services and if those would be allowed at trial" and that the court had "further questions as well." The court noted that it had looked through the exhibit file, that it had not seen any written agreements between the parties, and that "to the extent that clarifies the Court's questions, I wanted to put that on the record."

Following this statement by the juvenile court, Justin's attorney expressed concern that by conducting "independent research" in the court file without any party having "raised the issues about the existence of any written agreement," the court "may have shown partiality or the appearance that it may have attempted to actively advocate for the party." Accordingly, Justin's attorney asked the court to recuse itself.

The juvenile court then clarified further that its examination of the court file had been in response to the discussion at the conclusion of the first day of the hearing and to "make sure that it had a clear understanding so that it could respond accordingly if further questions arose." The court also noted that it had the ability to look at the court file "whenever necessary with regard to a matter," and it declined to recuse itself. When the court asked if there were any other preliminary matters, Justin's attorney stated that she was "not intending to accuse the [c]ourt of intentional inappropriateness, just simply . . . to allege that there would be an appearance of partiality or possible appearance of an advocation for a party." In response, the court stated, "And I appreciate that, but I would actually say in all due respect that I was looking out for your client's best interest by reviewing the court file." The hearing then proceeded with the presentation of the second day of evidence.

(b) Analysis

The Nebraska Revised Code of Judicial Conduct states that a judge shall recuse himself or herself from any proceeding in which the judge's impartiality might reasonably be questioned, including when the judge has a personal bias or prejudice concerning a party or a party's lawyer. *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023). To demonstrate that a trial judge should have recused himself or herself, the moving party must show that a reasonable person who knew the circumstances of the case would question the judge's impartiality

- 13 -

under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *Id.* See, also, *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023) (question is not simply whether someone could conceivably question judge's impartiality). There exists a presumption of judicial impartiality, and a party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming that presumption. *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020). A judge's opinions based on facts presented during a hearing, even if those opinions are stated before the hearing's conclusion, are not indicative of bias by the judge unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Id.*

In this case, Justin's attorney raised the issue of how Justin's participation in voluntary services would be treated for purposes of adjudication at a hearing prior to the adjudication trial. The issue was raised again by Justin's attorney during the questioning of witnesses on the first day of trial; discussed by the parties and the juvenile court at the end of the first day; and addressed by the court in an email to all parties in between the 2 days and again on the record at the start of the second day. The court noted that its review of the file was an appropriate action and that it was done for Justin's benefit. Upon our de novo review, we cannot say that a reasonable person would have questioned the juvenile court's impartiality in the adjudication proceedings. The court did not err in failing to recuse itself. This assignment of error fails.

### 2. SUFFICIENCY OF EVIDENCE FOR ADJUDICATION

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). The purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Xandria P., supra*. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *In re Interest of Draygon W. et al., supra*.

Justin asserts that the juvenile court erred in finding sufficient evidence that the children were at risk for harm and came within the meaning of § 43-247(3)(a). He challenges the court's findings as to each of the allegations of the operative petition. Upon our de novo review, we find that the court did not err in its decision adjudicating Justin's children.

### (a) Alcohol and Prescription Drug Use

The juvenile court found the children were at risk for harm due to Justin's use of alcohol and/or prescription drugs. Justin argues that there is not a sufficient nexus between his alleged alcohol and drug use and a risk of harm to the children, and he cites several cases in which an adjudication was reversed due to the lack of such a nexus.

In *In re Interest of Brianna B. & Shelby B.*, 9 Neb. App. 529, 614 N.W.2d 790 (2000), the children were adjudicated because of a pattern of alcohol use by the parents. While there was evidence that the parents had consumed alcohol in the children's presence, there was no evidence

to show that the children were impacted by their parents' drinking. This court concluded that the State failed to adduce sufficient evidence to show that the children lacked proper parental care due to the allegation of parental alcohol use. See, also, *In re Interest of Trenton W. et al.*, 22 Neb. App. 976, 865 N.W.2d 804 (2015) (reversing adjudication as to father where evidence insufficient to show definite risk of future harm due to father's single incident of heavy drinking and incident where mother gave father prescription pain pills).

In *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012), the mother ingested a morphine pill not prescribed to her. This court reversed the child's adjudication, finding no evidence that the child was affected by the mother taking the nonprescribed pill or any evidence that her doing so placed the child at risk. We held that "[w]hile taking an unprescribed medication may be illegal, a parent's illegal activity—without more—is not sufficient to adjudicate a child." *Id.*, 19 Neb. App. At 841, 812 N.W.2d at 322. There was evidence to suggest that the mother had been prescribed certain drugs other than morphine, and we found no evidentiary nexus between the consumption of drugs, "mostly pursuant to prescription," and any definite risk of future harm to the child. *Id.*

This court also reversed an adjudication order in *In re Interest of Carrdale H.*, 18 Neb. App. 350, 781 N.W.2d 622 (2010). There, the child was adjudicated due to the father's possession of illegal drugs. We noted that the State failed to adduce evidence of whether the father was charged with a crime, whether he had any history of drug use in or out of the child's presence, whether the child was present when the father possessed the drugs, or whether the child was affected in any way by the father's actions. We concluded that State failed to prove by a preponderance of the evidence the allegation that the father's drug use placed the child at risk for harm.

Here, there was evidence that Justin drinks alcohol in the home and that he has continued to take oxycodone from an "expired" prescription which Justin claims was originally given for dental issues. The juvenile court noted that Justin had never provided a copy of the prescription. The court expressed concern about Justin's oxycodone use given his contradictory statements regarding the purpose for the alleged prescription, the manner in which he obtained the prescriptions, the frequency in which he disclosed taking the medications, his failure to disclose use of the medication until after the positive drug test, and his minimization of the use. The court found these concerns placed the children at risk of harm.

In our de novo review of the record, while there is little evidence of a direct nexus between Justin's alcohol and prescription drug use and any past harm to the children, we find that there was sufficient evidence, under the preponderance of evidence standard, to support the trial court's conclusion that there is a risk of future harm. Although there was no evidence about Justin's alcohol and drug use when he was solely responsible for caring for the children, Samantha testified that Justin drank every night during the period that she lived with him. Justin disputed this testimony, but the juvenile court specifically found Samantha's testimony to be credible. The court, who heard and observed the witnesses, expressed concern that Justin was minimizing his alcohol and drug use. There was evidence suggesting Justin was impaired when he left voice messages threatening self-harm, although the children were not with him when these messages were made. The evaluator recommended intensive outpatient treatment for Justin, which Justin did not believe was necessary, although he had called to set up services and was on the waitlist.

Although the evidence was not entirely convincing, we conclude that the State met its burden of showing that the children were at risk for harm due to Justin's alcohol or drug use.

### (b) Exercise of Visitation Rights

The juvenile court found sufficient evidence that Justin had failed to exercise consistent rights of visitation with the children, and it noted his admission in the paternity case to not exercising agreed upon joint parenting time in the 6 months prior to entry of the August 2022 temporary order by the district court.

The evidence shows that Justin assisted in caring for Paislee during the months that Samantha was in treatment. Amy confirmed that Paislee stayed with Justin several days each week during this time. After Samantha finished treatment, and after Jayden's birth, Justin did not regularly see the children, although there is evidence that he had difficulty communicating with Samantha. While the evidence was in conflict about how much time Justin spent with the children prior to their removal, the juvenile court found Samantha's and Amy's recitation of the children's and Samantha's living arrangements prior to their removal more credible than Justin's.

Justin did not have an opportunity to exercise the parenting time granted by the final paternity order given the children's removal from Samantha's care and the initiation of the juvenile court case simultaneously with the entry of the paternity decree. There is evidence that Justin had not been exercising the full extent of his parenting time after removal, although there was evidence of issues with the record-keeping of the first service provider and evidence that Justin's on-call work schedule complicated his participation. The testimony from Gores and Amy about their observations of Justin's parenting during visits they supervised was generally favorable.

Given the conflicting evidence and acknowledging that the trial court heard and observed the witnesses, we find that the State adduced sufficient evidence that the children were at risk for harm due to Justin's failure to exercise the full extent of his visitation rights.

### (c) Care, Supervision, Support, Safety, and Housing

The juvenile court found sufficient evidence that Justin had failed to provide the children with proper care, supervision, support, and/or safety. The court noted evidence about Justin's lack of contact with the children in certain periods and failure to exercise full visitation periods, his lack of knowledge of certain facts about Layla and Jayden, Layla's academic delay at the time she was removed from his care, Justin's prioritization of Layla and his relationship with her mother over placement or custody of Paislee and Jayden, Samantha's testimony that Justin lacked nurturing skills and Layla's testimony that he does not give her hugs and kisses and calls her "stupid," concerns about Justin's threats of self-harm and overall mental health, and his child support delinquency.

The juvenile court also found sufficient evidence that Justin failed to provide the children with safe, stable and appropriate housing, noting Justin's failure to take affirmative steps to protect the children in light of his knowledge of Samantha's methamphetamine addiction. The court also noted Justin's lack of transparency with the Department with respect to the individuals staying in the residence where he lived and his evasiveness and contradictory representations with respect to the nature of his current relationship with Layla's mother.

The record shows that Justin has provided some care for the children since their births; including caring for Paislee when Samantha was in treatment and for both children when Samantha and the children lived with him. He also provided some child support following entry of the paternity decree. However, he has not provided sole care of the children on a regular basis, and there was evidence in the record suggesting that he was not interested in receiving placement of the children. We find that the State adduced sufficient evidence that the children were at risk for harm due to Justin's failure to provide care, supervision, support, safety, and appropriate housing.

### (d) False Imprisonment Conviction

The juvenile court noted that upon his December 2015 conviction of false imprisonment of a domestic partner, Justin was placed on probation and ordered to participate in a chemical dependency evaluation, AA/NA, parenting class, and the batterer's intervention program. The court found that many of the issues Justin was addressing in 2015 remained issues at the time of the adjudication. There was no evidence presented about Justin's compliance with any of the terms of his probation or the specifics of the incident that led to this conviction, which occurred more than 4 years prior to Paislee's birth. The State did not present sufficient evidence that the children were at risk for harm due to Justin's 2015 false imprisonment conviction.

### (e) Conclusion

A court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). However, the State must establish that without intervention, there is a definite risk of future harm. See *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). In light of our analysis of the juvenile court's findings with respect to adjudication, the court did not err in adjudicating the children as juveniles within the meaning of § 43-247(3)(a). Even though the State did not present sufficient evidence that the children were at risk for harm due to Justin's 2015 false imprisonment conviction, there was sufficient evidence presented as to the other allegations of the operative petition to show that that the children were at risk of harm due to Justin's faults or habits.

### VI. CONCLUSION

We conclude that the juvenile court did not err in denying Justin's motion to recuse the trial judge. As to adjudication, the evidence was sufficient to support the court's decision to adjudicate the children as juveniles within the meaning of § 43-247(3)(a). Accordingly, we affirm.

AFFIRMED.

- 17 -